UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JEFFREY A. FELDMAN and PRIMARY     **DEFENDANTS'**
SUCCESSION CAPITAL, LLC,     **MEMORANDUM OF**
     **LAW IN SUPPORT OF**
     **MOTION FOR**
     Plaintiffs,     **PARTIAL SUMMARY**
     **JUDGMENT**
  -against-
     08 CIV 4409 (Seibel, J.)
CONCORD EQUITY PARTNERS, LLC, POUYA
TOOBIAN, SCOTT SCHULTE and JOHN
MALINDRETOS,

     Defendants.
-------------------------------------------------------------X

## PRELIMINARY STATEMENT

Defendants Concord Equity Partners, LLC ("Concord"), Pouya Toobian ("Toobian"), Scott Schulte ("Schulte") and John Malindretos ("Malindretos"), by their counsel, Ruskin Moscou Faltischek, P.C., submit the following Memorandum of Law in support of their motion for partial summary judgment on their second and fifth affirmative defenses, dismissing plaintiffs' first and second causes of action, and on the defendants' first counterclaim to impose liability against plaintiff Jeffrey A. Feldman ("Feldman") for breach of contract.

This action arises out of the now-defunct financial services firm Concord in which plaintiff Feldman, Toobian, Schulte and Malindretos were founding members. Prior to abruptly terminating his relationship with Concord, plaintiff Feldman was a managing member of Concord, as well as its President and Head of Private Equity and a member of Concord's Board of Directors. Indeed, Feldman was intimately involved in Concord's business from the outset and had access to all relevant information regarding Concord's anticipated business and operations. Nevertheless, plaintiff Feldman commenced this action against the company he

helped create and his co-founders, accusing them of violating federal securities laws for failing to disclose *to him* the risks inherent in purchasing a membership interest in Concord.

Plaintiff's first and second claims for relief for alleged violations of Section 12(a)(1) of the Securities Act of 1933 must be dismissed. The undisputed material facts demonstrate that plaintiff Feldman was a founding member and insider of Concord and is not, therefore, within the class of persons entitled to the protection of the registration requirement. Indeed, prior to the commencement of this action, Feldman expressly represented and acknowledged – in writing – that the offering and sale of membership units in Concord was "exempt from registration under the Securities Act and U.S. state securities laws." Accordingly, plaintiff is unable to recover a judgment against the defendants on its first and second claims for relief.

In addition, defendant Concord is entitled to a judgment on its first counterclaim imposing liability on plaintiff Feldman for breach of contract. The Management Services Agreement entered into between Feldman and Concord provided Feldman the right to terminate the agreement for good cause, but only after he provided the company with 30 days notice and an opportunity to cure the objectionable condition. It is undisputed that plaintiff Feldman did not provide the requisite cure-period to Concord; but, instead by email on a Sunday night, he announced his resignation, effective immediately. As a result of Feldman's failure to comply with the express terms of the Management Services Agreement, Concord is entitled to a judgment imposing liability for breach of contract.

## BACKGROUND FACTS

The materials facts are not in dispute. Beginning in December 2006, plaintiff Feldman and defendant Schulte, along with Malindretos and Toobian (all four, "Founders"), began discussing the formation of a full-service financial services company in which the four of them would all have an ownership interest. Plaintiff Feldman's role would be to serve as the Chief Operating Officer and Chief Financial Officer of the new company, and in those capacities, Feldman would be responsible for overseeing all aspects of the company's daily operations. (Statement of Undisputed Material Facts ("Statement"), ¶ 7.)

From the outset, plaintiff Feldman, an experienced venture capitalist with approximately fifteen years experience raising capital for start up companies, was intimately involved in the planning and structuring of the new company. Feldman participated in the retention of Ruskin Moscou Faltischek, P.C., as attorneys for the new entity, to provide advice "in connection with general corporate matters relating to all aspects of this new venture including the organization of the Company, preparing an operating agreement among all of [its members] with respect to the Company and its business, advising the Company and preparing and/or reviewing documentation relating to its relationships and transactions with various parties, advising the Company and preparing documentation in connection with applicable regulatory matters, negotiating and preparing a lease for the Company, advising and representing the Company regarding intellectual property matters and other legal and business matters." (Statement, ¶¶ 11-12.)

The Founders, including plaintiff Feldman, were fully aware that the company needed to raise start-up capital from outside investors. Those funds would be used for such items as office space, build-out costs, equipment, marketing fees and attorney's fees, among other things. (Statement, ¶ 8.) Plaintiff was aware of the risks associated with the failure to raise -up capital:

if no start-up money came in, the new business would not be able to commence operations. Thus, to facilitate outside investments, plaintiff Feldman presented a "showcase" meeting in February 2007 with potential investors to communicate his extensive knowledge and experience and demonstrate that management was up to the task of running a successful financial services company. (Statement, ¶ 9.) Plaintiff Feldman even participated in drafting a business plan for Concord to be distributed to prospective investors. (Statement, ¶ 10.)

To save the costs associated with creating a wholly new entity, plaintiff Feldman and the other Founders determined to utilize the existing corporate "shell" for Alpha Securities, LLC ("Alpha").[1] (Statement, ¶ 13.) On May 7, 2007, Alpha filed a Certificate of Amendment to its Articles of Organization to change its name to Concord Equity Partners, LLC – the name chosen by Feldman and the other Founders for their new venture. (Statement, ¶ 14.)

Beginning in or about June of 2007, plaintiff Feldman and his co-Founders began negotiating their operating agreement for Concord. Over the ensuing weeks, the Founders exchanged several drafts, and each of the Founders – Feldman included – had an opportunity to provide feedback and propose modifications. In fact, plaintiff Feldman retained a separate attorney, Ann E. Gill, Esq., then a partner at Thelen Reid Brown Raysman & Steiner, LLP, to represent him in the negotiation of the operating agreement. (Statement, ¶ 15.) The operating agreement was signed by the parties on or about September 15, 2007 ("the Operating Agreement"). (Statement, ¶ 16.)

The Operating Agreement specifies that the purpose of Concord shall be to "to engage in the business of providing financial services, including without limitation asset management and private equity services, hedge fund investment opportunities and securities trading." (Statement,

---

[1] Toobian created Alpha on or about February 22, 2006, but since its formation, it never engaged in any business under the Alpha name. (Statement, ¶¶ 4-5.)

4

¶ 18.) The Operating Agreement bifurcates the decision-making authority for Concord among the managing members and the board of directors. The managing members are responsible for the "day-to-day management of the business, operations and affairs of the Company," while the board is responsible for setting the "overall strategy and direction of the Company." (Statement, ¶ 19.)

The Operating Agreement designated plaintiff Feldman as both a "managing member" and member of Concord's board of directors. In those capacities, Feldman not only controlled Concord's day-to-day management, but was also responsible for Concord's overall strategy and direction. (Statement, ¶¶ 17, 19.)

Plaintiff Feldman also served as Concord's President pursuant to the Operating Agreement and a separate Management Services Agreement that Feldman executed at the same time as the Operating Agreement. (Statement, ¶¶ 20, 27.) As Concord's President, plaintiff Feldman's role "was to act as chief operating officer, which meant manage the day-to-day operations of the firm. And in addition, act as chief financial officer and maintain the books and records, financial records of the company. And execute checks for the company, payments for the company, and also to get [his] securities licenses, so that [he] can perform the function of compliance." (Statement, ¶ 28.) Plaintiff Feldman needed several FINRA licenses in order to discharge his duties as President, including the General Securities Principal (Series 24) license. As Concord's only Series 24 licensee, Feldman was the company's sole resource for issues relating to the securities laws. (Statement, ¶ 29.)

The Operating Agreement that the Founders negotiated and signed calls for Feldman and the other Founders to make capital contributions to Concord in exchange for membership units. (Statement, ¶ 21.) Plaintiff Feldman, through Primary Succession Capital, LLC, an entity owned

5

and managed by him, made his first capital contribution of $50,000 in exchange for membership units in Concord on September 27, 2007 (after the execution of the Operating Agreement) and his second contribution in the amount of $50,000 three months later. (Statement, ¶ 32.) The Operating Agreement specifically provides that these capital contributions are non-refundable under any circumstances. (Statement, ¶ 21.)

Plaintiff Feldman and Concord's other Founders intended that the transfer of membership units to each of them would be exempt from the registration requirements of the federal and state securities laws. Specifically, in the Operating Agreement, each Founder, including Feldman, acknowledged that "***the offering and sale of the Units are intended to be exempt from registration under the Securities Act and applicable U.S. state securities laws***" in reliance on the private placement exemption from registration provided in Section 4(2) of the Securities Act and Regulation D promulgated thereunder and exemptions under applicable U.S. state securities law." (Statement, ¶ 22 (emphasis added).) To remove any doubt that the membership units sold to Feldman and the others did not need to be registered, plaintiff Feldman further acknowledged that he "***has been given the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of, and other matters pertaining to, this investment, and has had access to such financial and other information concerning the Company as [he] has considered necessary to make a decision to invest in the Company and has availed itself of this opportunity to the full extent desired.***"[2] (Statement, ¶ 23 (emphasis added).)

---

[2] Even though the Operating Agreement specifies that Feldman is entitled to purchase the units, as a concession, Feldman purchased the Concord units through a separate entity, plaintiff Primary Succession Capital, LLC ("Primary Succession"). This, however, does not alter the analysis or require an outcome other than dismissal of plaintiffs' first and second causes of action. For purposes of the plaintiffs' claims in this action, Feldman and Primary Succession are

Feldman's Management Services Agreement gave both the company and Feldman the right to terminate the Agreement. Concord could terminate the Agreement as a result of Feldman's "deliberate or intentional failure . . . to substantially perform his duties hereunder that results in material harm to the Company," among other reasons. (Statement, ¶ 30.) Feldman, on the other hand, was permitted to terminate only for "good reason," which was defined in the Agreement,[3] and only after Feldman provided written notice to Concord explaining the "good reason" for the termination and providing the company with 30 days to cure the condition. (Statement, ¶ 31.)

On February 3, 2008, plaintiff Feldman sent an email to Concord announcing his resignation. Feldman's purported termination was effective immediately; he never provided Concord with the requisite cure period required by the Management Service Agreement. (Statement, ¶ 35.)

On February 8, 2008, Concord terminated Feldman's employment for cause as a result of Feldman's "unequivocal abandonment" of his position as President. (Statement, ¶ 37.)

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action on or about May 9, 2008. By their first cause of action, brought pursuant to Section 12(a)(1) of the Securities Act of 1933 (the "1933 Act"), plaintiffs seek, *inter alia*, to rescind their purchase of the Concord units, alleging that the units were not

---

one and the same. Primary Succession, through its managing member plaintiff Feldman, had access to all material and relevant information that a registration statement would have disclosed.
[3] The Management Services Agreement defines "good reason" as "(i) a material diminution during the Retention Period in the Service Provider's duties or responsibilities as set forth in Section 2 hereof; (ii) a breach by the Company of the compensation and benefits provisions set forth in Section 3 hereof; (iii) a breach in any material respect by the Company of any of the terms of this Agreement, other than specifically provided herein; or (iii) [*sic*] the relocation, without the Service Provider's consent, of the Company's principal place of business beyond 35 miles from its current location." (Didora Decl., Exh. 5, ¶ 4(b).)

properly registered and that plaintiffs were not given a prospectus prior to purchasing, with "proper risk disclosures." (Declaration of Matthew F. Didora dated July 31, 2009 ("Didora Decl."), Exh. 8, ¶¶ 30-38.)

Plaintiffs' second cause of action seeks to hold the individual defendants, Feldman's co-Founders, Schulte, Malindretos and Toobian, personally liable pursuant to Section 15 of the 1933 Act for the alleged failure to register because of their "positions as directors, members and/or senior executives of Concord, their control of a major portion of Concord's voting interests, and their business and/or personal relationships with the other Individual Defendants." (Didora Decl., Exh. 8, ¶¶ 39-42.)

Defendants served their Answer on or about August 22, 2008. In addition to denying any wrongdoing, Defendants asserted defenses. In those defenses, defendants claimed, among other things, that: "[t]he securities referred to in the complaint are exempt from registration"; "Feldman, as an original founder and owner of Concord, does not have standing to assert claims under the Securities Act of 1933"; "Plaintiffs' claims are barred based upon Feldman's own participation in each of the activities set forth in the complaint"; "Defendants relied upon the knowledge and expertise of plaintiff Feldman in offering units of Concord for sale"; and "Defendants are not 'controlling persons' within the meaning of 15 USC § 77o." (Didora Decl., Exh. 9, ¶¶ 55, 58, 60, 61 and 64.)

Concord also asserted a counterclaim against plaintiff Feldman for breach of the Management Services Agreement, which clearly conditions Feldman's right to terminate his employment on his first giving "written notice stating with specificity the reason for [his] termination" and affording Concord 30 days to cure the identified breach. (Statement, ¶ 31.) Feldman's sudden withdrawal from Concord deprived the Company of vital management

personnel and violated the Management Services Agreement regardless of his reasons for withdrawal.

Defendants now seek partial summary judgment dismissing the plaintiffs' first and second claims for relief, and granting judgment of liability against Feldman on Concord's counterclaim. The undisputed material facts, particularly the express language of the Operating Agreement, preclude plaintiffs from recovering against the defendants for any alleged violations of the securities laws. Similarly, plaintiff Feldman's abrupt departure from Concord without prior notice (not to mention opportunity to cure) in the face of the clear language of the Management Services Agreement, is sufficient to establish his liability for breach of contract as a matter of law.

## ARGUMENT

### POINT I

**Defendants Are Entitled to Summary Judgment Dismissal of Plaintiffs' First and Second Claims for Relief**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). The moving party must demonstrate its entitlement to judgment as a matter of law by presenting evidence on each material element of his claim or defense. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Once the moving party has satisfied its initial burden, the non-moving party cannot rely "merely on allegations or denials" but rather must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Proc. 56(e)(2). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-

moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In the absence of any disputed material fact, summary judgment is appropriate.

In this case, there are no material issues of fact between the parties; summary judgment should be granted dismissing plaintiffs' first and second causes of action and imposing liability against plaintiff Feldman on Concord's counterclaim for breach of contract. All of the material facts upon which defendants' motion is based are taken from the deposition testimony of plaintiff Feldman or the express language of unambiguous documents executed by the parties.

## POINT II

### Plaintiff Feldman, as a Founding Member and Insider of Concord, Is Not Within the Class of Persons Protected by Section 5 of the 1933 Act

The lynchpin of plaintiffs' first and second causes of action is Concord's alleged failure to register the membership units in Concord in accordance with Section 12(a)(1) of the Securities Act of 1933 ("the Securities Act").[4] In Feldman's view adopted for the purpose of this case, "[t]he Units of Concord do not constitute a class of securities exempt from registration pursuant to any of the provisions of the 1933 Act, nor were these securities offered and sold in a transaction exempt under the provisions of the 1933 Act." (Didora Decl., Exh. 8, ¶ 35.) Putting aside the inherent incongruity of plaintiffs claiming to have been wronged by Concord's failure to file a registration statement – a failure at least as attributable to plaintiff Feldman, Concord's President and chief compliance officer as anyone else – plaintiffs' claims fail as a matter of law.

---

[4] Plaintiffs' second cause of action is derivative of the first. Plaintiffs cannot recover against the Founders as "controlling persons" unless they first succeed on their primary claim under Section 12(a)(1) of the 1933 Act. *See In re AIG Advisors Group*, 2007 WL 1213395, 06 Civ 1625 (JG) (E.D.N.Y. 2007). In other words, if the Court grants defendants summary judgment as to plaintiffs' first claim, then defendants are also entitled to summary judgment dismissing the second claim for relief as well. In any event, the Operating Agreement specifically exculpates the managing members and the board of directors – including each of the individual defendants in this action – from liability for monetary damages for any act or failure to act in connection with their involvement with Concord. (Statement, ¶ 26.)

Section 12(a)(1) of the 1933 Act states:

> Any person who offers or sells a security in violation of section [5]... shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(1) (2009).

Section 5 of the 1933 Act prohibits the sale or transfer of any security "[u]nless a registration statement is in effect as to the security." 15 U.S.C. § 77(e)(a)(1) (2009). The registration statement must be filed with the Securities and Exchange Commission, 15 U.S.C. § 77(f) (2009), and must contain information relating to the ownership and management of the issuing company and the nature of the securities being offered for sale. *See* 15 U.S.C. § 77aa (Schedule A) (2009). The purpose of the registration statement is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). In other words, the registration disclosures are necessary to protect those that are not "able to fend for themselves." *Id.* at 125. To establish a prima facie claim under Section 5, the plaintiff must demonstrate (i) the lack of a registration statement, (ii) the offer or sale of securities not otherwise exempt from registration, and (iii) the use of interstate transportation or communication and the mails in connection with the offer or sale. *SEC v. Empire Development Group, LLC*, 2008 WL 2276629, 07 Civ. 3896 (PKC), *7 (S.D.N.Y. 2008).

Not all securities, however, require a registration statement. Section 4(2) of the 1933 Act expressly states that "transactions by an issuer not involving any public offering" are exempt from registration. 15 U.S.C. § 77d(2) (2009). That exemption is the flip side of the rule requiring the registration statement. If registration is designed to protect members of the public

from lack of access to corporate information, the Section 4(2) exemption recognizes that certain investors have access to the same type of information that a registration statement would disclose to the general public, so as to those non-public investors, no registration is necessary. *Ralston Purina Co.*, 346 U.S. at 125; *Empire Development Group, LLC*, 2008 WL 2276629, at *9. The critical question in determining whether a particular offering is "public" or "private" is "whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959); *Eriksson v. Galvin*, 484 F.Supp. 1108, 1117 (S.D.N.Y. 1980). Other factors that courts consider are the number of offerees, the sophistication and experience of the offerees, the nature and kind of information provided or that the offerees have access to, the size of the offering and the precautions to prevent the offerees from re-selling their securities. *See Steed Fin. LDC v. Nomura Sec. Internat'l*, 2001 WL 1111508, 00 Civ. 8058 (NRB), *5 (S.D.N.Y. 2001).

Applying these factors to the present case, it is clear that the offering of membership units to the Founders, including plaintiffs, was clearly a private offering to which the registration requirements did not apply. Indeed, plaintiff Feldman so acknowledged at the time he purchased units for his wholly-owned entity, Primary Successive Capital. (Statement, ¶ 22.) The offering in which Feldman participated was made by virtue of Article 5.1 of the Operating Agreement, requiring that Feldman, Schulte and Malindretos make cash capital contributions in two installments, the last of which was to be completed prior to January 31, 2008. That offering was extended to three individuals – each a Founder of Concord and involved in its formation from the outset, and who were also officers and members of Concord's board of directors. In those capacities, the Founders had unfettered access to all pertinent information relating to Concord's

current business and projected growth and earnings. In fact, they were the ones who were creating the projections and charting the direction of the company.[5]

That these offerees had unlimited access to Concord's books and records sufficient to permit each of them to make an informed decision regarding whether to purchase membership units cannot be denied. By executing the Operating Agreement, the Founders represented to each other and to Concord that they had "been given the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of, and other matters pertaining to, this investment, and has had access to such financial and other information concerning the Company as [he] has considered necessary to make a decision to invest in the Company and has availed [him]self of this opportunity to the full extent desired." (Statement, ¶ 23.)

Plaintiffs Feldman and Primary Succession specifically acknowledged that at the time the Concord units were purchased, they were aware of the members of Concord's board of directors (Statement, ¶ 34), the identity and resumes for each of Concord's officers (Statement, ¶ 34), the nature of Concord's business, including asset management and private equity services (Statement, ¶ 34), and that they had reviewed projected financial statements (Statement, ¶ 34) and had reviewed and participated in drafting Concord's business plan (Statement, ¶ 34).

Based upon these undisputed facts, it is obvious that the sale of Concord units to plaintiffs was a part of a private offering that was exempt from the registration requirements of Section 5 of the 1933 Act. Feldman was clearly a person who could "fend for himself" (*see Ralston Purina*, 346 U.S. at 125) in connection with Concord's operations. There is nothing in the registration statement which would have disclosed the risks about which Feldman now

---

[5] If the information used to register were required, it was the Founders, including plaintiff Feldman, who would have been the ones to prepare the statement.

13

complains. Plaintiff Feldman – an experienced venture capitalist for over 15 years – claims that he should have been informed (i) about the risks to Concord's business if Malindretos was not able to secure at least $2 million in capital, and (ii) if Schulte were unable to transfer over to Concord $100 million in assets for management. *See* Feldman Dep., pp. 85–86. That claim is incredible as a matter of law given plaintiff Feldman's credentials, experience and representations and acknowledgements. (*See* Statement, ¶¶ 1-3.) Furthermore, Feldman even acknowledged that he knew there was a chance that Malindretos and Schulte would be unsuccessful. (Statement, ¶ 8.)

Furthermore, Feldman was aware that there was no registration statement on file with the SEC – and he even participated in drafting the Operating Agreement to inform Concord's members that "***the offering and sale of the Units are intended to be exempt from registration under the Securities Act and applicable U.S. state securities laws*** in reliance on the private placement exemption from registration provided in Section 4(2) of the Securities Act." (Statement, ¶ 22.)

Plaintiffs' claim that they have been victimized by Concord's failure to file the registration statement is completely disingenuous. Defendants are entitled to summary judgment on their second and fifth affirmative defenses dismissing plaintiffs' first and second causes of action.

## POINT III

### Plaintiff Feldman Breached the Management Services Agreement

The Management Services Agreement provides Feldman a right to terminate the agreement for specified reasons, but only if Feldman first provides written notice to Concord of the alleged "good reason" to terminate and allowed Concord 30 days to remedy the condition.

(Statement, ¶ 31.) For purposes of this motion only, it is not necessary to examine whether Feldman had "good reason" to terminate because the undisputed facts clearly establish that Feldman failed to comply with a condition precedent to termination by not extending to Concord the requisite cure period.

On February 3, 2008, Feldman notified Concord that he was resigning from the Board of Directors and stepping down as President and Head of Private Equity because of what he perceived as various diminutions to his authority over Concord's business. (Statement, ¶ 35.) Plaintiff Feldman never provided the requisite prior notice of his intention to resign, and never afforded Concord its contractual cure period. Instead, in a February 3rd email, he announced his resignation, effective immediately. (Statement, ¶ 36.) Plaintiff Feldman admitted at his deposition, albeit reluctantly, that he never provided Concord an opportunity to cure the default. (Statement, ¶ 36.)

Because Feldman did not properly act to terminate the Management Services Agreement, there is no question that he breached its terms when he failed to work after February 3, 2008. *Filmline (Cross-Country) Prods. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989) (noting that where parties to an agreement require specific conditions before a party may terminate, the agreement must be strictly construed in accordance with its terms); *see also Sauer v. Xerox Corp.*, 17. F. Supp. 2d 193, 197 (W.D.N.Y. 1998). Concord appropriately terminated Feldman for his abandonment of his duties and responsibilities under the Management Services Agreement.

## CONCLUSION

Defendants are entitled to summary judgment dismissing plaintiffs' first and second causes of action. Plaintiff Feldman's own deposition testimony as well as the express language of the Operating Agreement make clear that Feldman was an insider at Concord and had access to all information that a registration statement would have disclosed. Simply put, Feldman is not the type of person that the registration requirement was intended to protect.

Furthermore, plaintiff Feldman admits that he never provided Concord with advance notice of his intention to terminate the Management Services Agreement and never provided the contractually mandated cure period. Therefore, defendant Concord is entitled to summary judgment for liability on its first counterclaim against Feldman.

Dated: Uniondale, New York
       July 31, 2009

                                   RUSKIN MOSCOU FALTISCHEK, P.C.

                                   By: _____
                                       Douglas J. Good
                                       Matthew F. Didora
                                       *Attorney for Defendants*
                                       1425 RXR Plaza
                                       East Tower, 15th Floor
                                       Uniondale, New York 11556
                                       (516) 663-6600

16