UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JEFFREY A. FELDMAN and PRIMARY
SUCCESSION CAPITAL,

                            Plaintiffs,

- against -                                        08-CV-4409 (CS)

CONCORD EQUITY PARTNERS, LLC, POUYA        **MEMORANDUM DECISION**
TOOBIAN, SCOTT SCHULTE and JOHN              **AND ORDER**
MALINDRETOS,

                            Defendants.
-------------------------------------------------------------------x

Appearances:

Thomas J. Romans, Esq.
Hackensack, New Jersey
*Counsel for Plaintiffs*

Douglas J. Good
Ruskin Moscou Faltischek, P.C.
Uniondale, New York

Matthew F. Didora
Westermann, Hamilton, Sheehy, Aydelott and Keenan, LLP
Garden City, New York
*Counsel for Defendants*

Seibel, J.

       Before this Court is Defendants' Motion for Summary Judgment on Plaintiffs'

securities law claims and on Defendants' breach of contract counterclaim.

**I.**      **Background**

       Plaintiffs Jeffrey Feldman and Primary Succession Capital ("PSC") bring claims

against Defendants Concord Equity Partners, Pouya Toobian, Scott Schulte, and John

Malindretos for: (1) violation of Section 12(a)(1) of the Securities Act of 1933 ("1933

Act"), 15 U.S.C. § 77*l*(a)(1); (2) violation of Section 15 of the 1933 Act, 15 U.S.C. §

1

77o; and (3) breach of contract.  Defendants assert counterclaims for breach of contract and breach of fiduciary duty.  Plaintiffs allege that Defendants sold unregistered securities in violation of the 1933 Act and violated an employment contract.  Defendants argue that the securities were not offered publicly and were therefore exempt from the registration requirement, and that Plaintiff Feldman breached the employment contract and his duties as a manager.

In December 2006 Defendant Schulte approached Plaintiff Feldman with the idea of starting an investment firm.  (Defendants' Rule 56.1 Statement ("Defs.' 56.1") ¶ 6; Declaration of Matthew F. Didora in Support of Defendants' Motion for Summary Judgment ("Didora Decl.") Ex. 11 ("Feldman Dep.") at 21.)  Schulte thought Feldman could "help him structure [the] firm."  (Feldman Dep. at 22.)  Feldman thought that "[i]t was something [they could] start from the ground up."  (*Id*. at 24.)  Schulte wanted Feldman "to come in and really head up the operations," serving as Chief Operating Officer and Chief Financial Officer—roles that collapsed into the title of President.  (*Id*. at 30-31; Defs.' 56.1 ¶ 7.)  By April 2007 Plaintiff Feldman had decided to become involved in this capacity.  (Feldman Dep. at 30-31.)

In June or July of 2007, Plaintiff Feldman and Defendants began creating an Operating Agreement for the new firm, Concord Equity Partners ("CEP").[1]  (Defs.' 56.1

---

[1] This was technically a "revised" operating agreement.  An operating agreement already existed for Alpha Securities, LLC ("Alpha")—the predecessor to Concord Equity Partners.  Alpha was a company the sole owner of which (and the sole signer of the operating agreement of which) was Defendant Toobian.  (Didora Decl. Ex. 2; Feldman Dep. at 26.)  Alpha had no assets, no liabilities, and no operating history.  (*See* Declaration of Thomas Romans in Opp'n to Defendants' Motion for Summary Judgment ("Romans Decl.") Ex. A; Feldman Dep. at 26 (Feldman not aware of Alpha conducting any business).)  Instead of starting a new entity, Defendant Toobian and the other founders of Concord Equity Partners simply decided to change Alpha's name to Concord Equity Partners and revise the operating agreement.  (Didora Decl. Ex. 2.)

¶ 15; Feldman Dep. 46.)  The Parties exchanged drafts of the Operating Agreement and Feldman had an opportunity to review and comment on these drafts.  (Defs.' 56.1 ¶ 15; Feldman Dep. at 58-59.)  The final version was signed on September 15, 2007.  (Defs.' 56.1 ¶ 16.)  The Operating Agreement listed eleven Members who were supposed to make initial capital contributions to CEP.[2]  (Didora Decl. Ex. 3 ("Op. Agreement") at § 5.1, Schedule A.)  In exchange for their capital contributions, the Members would receive units of interest in the company.  Of the eleven Members, seven were designated as members of the CEP's Board of Directors.[3]  (*Id.* at Schedule B.)  Scott Schulte was designated as the CEO, Jeffery Feldman as President, and Daniel Kerrigan as Executive Vice President ("Managing Members").  (*Id.* at § 7.1.)  The Managing Members were responsible "for the day-to-day management of the business," while the "overall strategy and direction of the Company [would] be determined by the Board of Directors."  (*Id.* § 7.1.1-7.1.2.)

Each Member, by signing the Operating Agreement, represented that it was an "accredited investor," (*id.* § 11.1.1(m)), and had been given

> the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of, and other matters pertaining to, this investment, and has had access to such financial and other information concerning the Company as it has considered necessary to make a decision to invest in the Company and has availed itself of this opportunity to the full extent desired.

---

[2] Nine Members were listed as individuals, two as companies.  One of the companies listed was Plaintiff Primary Succession Capital, LLC.  Plaintiff Feldman appears to be the sole owner of PSC. (Defendants' Memorandum of Law in Support of Summary Judgment ("Defs.' Mem.") at 5-6 & n.2.)  The other company listed was Silver Lining Capital, LLC.  This company appears to be owned by Daniel Kerrigan.

[3] The Board of Directors consisted of Pouya Toobian, Scott Schulte, Jeffrey Feldman, Daniel Kerrigan, John Malindretos, Theodore Manousakis, and Nicholas Pandis.

(*Id.* § 11.1.1(q).)

The signing Members represented that they "underst[ood] that the offering and sale of the Units are intended to be exempt from registration under the Securities Act and applicable U.S. state securities laws in reliance on the private placement exemption from registration provided in Section 4(2) of the Securities Act and Regulation D . . . ." (*Id.* at 11.1.1(l).)

Also, on September 17, 2007, Plaintiff Feldman signed a Management Services Agreement "pursuant to which [he] agreed to serve as President and head of Private Equity" of CEP. (Didora Decl. Ex. 5; Defs.' 56.1 at ¶ 27.) Feldman, as part of his role as President, was in charge of compliance. (Feldman Dep. at 69.)

Pursuant to Schedule A of the Operating Agreement, Feldman was given a 10% equity stake in CEP for his services. He also committed to purchase $100,000 worth of units in the company. (Op. Agreement Schedule A.) This commitment was made as a result of conversations between Feldman and Schulte from which Feldman understood that management personnel were expected to put money into the business. (Feldman Dep. at 33-34.) Schulte suggested that Feldman invest $50,000, but Feldman volunteered to invest $100,000. (*Id.* at 34-35.)

**II.** **<u>Analysis</u>**

    A.    *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue of fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* On a motion for summary judgment, courts must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks omitted). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party "to present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

    B.    *Section 12(a)(1) Claims*

Section 5 of the 1933 Act, 15 U.S.C. § 77e, states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful . . . to sell such security" through interstate commerce. 15 U.S.C. § 77e(a)(1); *see Pinter v. Dahl*, 486 U.S. 622, 627 n.4 (1988). Section 12(a)(1) of the 1933 Act provides that "any person who offers or sells a security in violation of section 77e . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(1). Plaintiffs allege that Defendants are liable under Section 12(a)(1) for offering and selling unregistered units in CEP.[4]

---

[4] Plaintiffs argue that it was PSC that purchased the units, not Feldman, taking issue with Defendants' treatment of PSC and Feldman as one and the same. Presumably, Plaintiffs do this so they can argue that PSC did not have the inside information that Feldman did and was therefore entitled to greater protection under the securities laws. Plaintiff is correct that PSC is listed on Schedule A as the capital contributor, but the evidence indicates that this is a distinction without a difference. Feldman's own testimony shows that he viewed the investment as his own. In his deposition he stated that "as principals or people coming into the firm at the senior level, we would be expected [to] buy . . . units in the LLC." (Feldman Dep. at 33.) It appears that Feldman is the sole owner of PSC, and simply used the entity as a vehicle to purchase the units

The threshold question is whether the units of CEP should be classified as securities. Determining whether an interest in an LLC is a security "requires a 'case-by-case analysis' into the 'economic realities' of the underlying transaction." *United States v. Leonard*, 529 F.3d 83, 89 (2d Cir. 2008) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990)). An interest is not classified as a security if the members of the LLC are expected to play an active role in the management of the company. *Id.* Here, seven of the eleven Members of CEP (including Plaintiff Feldman) were on the company's Board of Directors, and could certainly be regarded as playing an "active role." Accordingly, there is a strong argument to be made that the units in CEP were not securities to begin with and that registration was not necessary on that ground alone. But because neither party has objected to classifying the units as securities, and because it is unclear whether the Members who did not sit on the Board of Directors (and any additional offerees who did not end up investing) were expected to play an "active role" in the company, the Court assumes that the units were securities for the purpose of this Motion.[5]

---

that he—as a principal of the firm—was "expected" to buy. In any case, as the sole owner of PSC, Feldman's access to information and knowledge of the risks of investing in CEP are imputed to PSC. The Court sees no reason to treat the two parties differently in determining the level of protection to which they are entitled. *Cf.* 17 C.F.R. § 230.501(a)(8) (if accredited investor is sole owner of entity, entity is accredited investor). Indeed, if the Court were to accept Plaintiffs' theory that PSC is the actual investor and Feldman is not, Feldman would not have standing to bring the securities claims. *See Pinter*, 486 U.S. at 644 (only people who actually purchased security interests in the company have standing to sue).

[5] Oddly though, every case cited by Plaintiffs focuses on precisely this issue, reinforcing the fact that the classification of CEP units as securities is not a foregone conclusion. In the cases cited by the Plaintiff, the issue is whether the investments are classified as securities, not whether the offering of such securities requires registration. (*See* Plaintiff's Memorandum in Opp'n to Summary Judgment ("Pls.' Mem.") at 11 (citing *Leonard*, 529 F.3d 83; *Holden v. Hagopian*, 978 F.2d 1115 (9th Cir. 1992); *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981); *SEC v. Parkersberg Wireless, LLC*, 991 F. Supp. 6 (D.D.C. 1997))).

Assuming the units in CEP are securities, they may still qualify for an exception to the registration requirement. Section 4(1) of the 1933 Act, 15 U.S.C. § 77d(2), exempts from registration "transactions by an issuer not involving any public offering." *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 120 (1953). "[T]he applicability of § 4(1) should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction not involving a public offering." *Id.* at 125 (internal quotation marks omitted). "[T]he governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *See Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959). Factors commonly considered in determining whether an offering is public include: "(1) the number of offerees; (2) the sophistication and experience of the offerees; (3) the nature and kind of information which has been provided; (4) the size of the offering and the precautions taken to prevent the offerees from reselling their securities." *Steed Fin. LDC v. Nomura Sec. Int'l*, No. 00-CV-8058, 2001 WL 1111508, at *5 (S.D.N.Y. Sept. 20, 2001).

Applying this legal standard to the undisputed evidence, I find that the "offering" in this case was not public and registration was not necessary under the 1933 Act. The factors listed above militate in favor of classifying the offering as private. Plaintiff Feldman's declaration and deposition testimony indicate that Defendants only solicited a small group of individuals to invest in the company. (*See* Affidavit of Jeffrey Feldman ("Feldman Aff.") ¶ 9, 13-14, 17-18 (Defendant Malindretos had "a limited number" of wealthy private investment clients, an unknown number of whom he solicited to invest in

7

CEP); Feldman Dep. 66-67 (Malindretos's potential investors were "names on a sheet of paper.").)  Only four outside investors are named in the Operating Agreement.  (*See* Op. Agreement Schedule A.)  All of the investors who ended up signing the Operating Agreement represented that they were "accredited investors," (*id*. § 11.1.1(m)), with "knowledge and experience in financial and business matters" and the ability to "evaluat[e] the merits and risks" of their investment, and that they had been given access to any information they thought necessary to make an informed investment decision (*id.* § 11.1.1(p)-(q)).  The monetary size of the offering was also relatively small.  Plaintiff admits that the goal was only to raise about $2 million.  (*See* Pls.' Mem. at 3.)  Strict limitations were put in place with respect to reselling membership units.  (*See* Op. Agreement § 9.1.)

      As mentioned above, the purpose of the registration requirement is to protect investors who cannot "fend for themselves."  Feldman does not fall into this category.  Since April 2007 at the latest, Plaintiff knew that he would be serving as a managing member of CEP.  (Feldman Dep. at 30.)  With this leadership role in mind, he played a significant role in drafting the Operating Agreement that summer.  (*See* Feldman Dep. at 46, 58-59.)[6]  Therefore, he was well aware of the provision in the Operating Agreement stating that the units were intended to be exempt from registration.  Having had, at the very least, several opportunities to edit this provision, Plaintiff cannot now turn around and sue the very people with whom he helped draft the Operating Agreement for not registering the units he purchased.[7]  Further, because he was involved in the formation of

---

[6] Notably, Feldman stated, "*We* were creating the operating agreement . . . that summer."  (Feldman Dep. at 46 (emphasis added).)

[7] In fact, as one of the crafters of the Operating Agreement, (Feldman Dep. at 46), and as a participant in at least one of Malindretos's pitches to investors (Feldman Dep.

the company, does not claim he lacked access to its records (indeed, maintaining the records was his responsibility), and was aware of the risks involved, (Feldman Dep. at 64-65), he had access to the information that a registration statement would have included.

Indeed, the Supreme Court in *Ralston Purina*, the landmark case on this issue, noted that an offering "made to executive personnel who because of their position have access to the same kind of information that the act would make available in the form of a registration statement" should generally be classified as a private offering. *See Ralston Purina*, 346 U.S. at 125-26. Plaintiff Feldman argues that he was offered the units before he was given an employment agreement or entered into the Operating Agreement, implying that he was not yet an insider when the units were offered. (*See* Pls.' Mem. at 9.) This argument is untenable. First, Schulte's discussions with Feldman in the spring of 2007 regarding Feldman's prospective role in the firm and the expectation that he invest cannot be considered an "offer" requiring registration within the meaning of the securities law. There is no evidence that the nature of the securities was even defined at that time. The evidence indicates that Schulte was simply soliciting participation and financial support for a start-up business. (*See* Feldman Dep. at 22-24, 30-31.) Feldman agreed to invest because Schulte said that principals would be expected to contribute capital to the new venture, not because he was offered securities by one of the Defendants. (*See id*. at 33-35.) To hold that such preliminary discussions trigger securities law registration requirements would create a severe impediment to the creation of small businesses. Second, even if the Court were to consider those discussions an

---

27-29), Feldman may be *in pari delicto* with the Defendants. *See generally Pinter*, 486 U.S. at 637-41. I need not decide that issue, however, given my conclusion that the offering was not public.

"offer" within the meaning of securities laws, Feldman's deposition testimony confirms that he agreed to become an executive officer of the firm before he was "offered" securities by Schulte.  (*See* Feldman Dep. at 30 (Feldman "decided" to participate in March or April of 2007); *id.* at 34 (the "discussion regarding buying an interest or investing capital" occurred in May 2007).)  As an executive officer and initial member who played an integral role in starting the business, there is no indication that Feldman was not privy to all material information and the risks of investment when he purchased equity in the company.  The law does not contemplate that executive officers such as Plaintiff, with his level of access to information, be able to avail themselves of Section 12(a)(1).  *See Ralston Purina*, 346 U.S. 125-26 & n.12.[8]

In light of the limited nature of the offering, the self-professed sophistication of the investors, and the restrictions placed on resale, I find that the units in CEP were sold privately.  Furthermore, Plaintiff Feldman (and by imputation, Plaintiff PSC), given his

---

[8] Plaintiffs argue that a rescission offer that was later extended constitutes "an admission that the offering was tainted." (Pls.' Mem. at 10.)  But the only supporting evidence that the rescission offer was prompted by a registration violation is Feldman's affidavit, in which he attributes to third parties "suspicions," (Feldman Aff. ¶ 19), or "concerns," (*id.* ¶ 22).  Even if I were to consider these hearsay allegations for their truth, *see Siegel v. Metro-North Commuter R.R. Co.*, No. 07-CV-6025, 2009 WL 889985, at *2 (S.D.N.Y. April 1, 2009) ("the Court cannot consider hearsay on a motion for summary judgment"), that some doing business or associated with CEP had "suspicions" or "concerns" does not establish a registration violation.  Were I to conclude from the rescission offer that the securities laws had in fact been violated, I would be discouraging self-evaluation and caution on the part of issuers.

Contrary to Plaintiff Feldman's assertions, language in the January 10, 2008 rescission letter—drafted by Plaintiff Feldman himself (*see* Romans Decl. Ex. A)—further supports the conclusion that the units were offered privately.  A portion of that letter states that the Financial Industry Regulation Authority may deem the offering a "private broker-dealer self-offering," and explains the risks of investing in such a "*private*" offering.  (*See id.* (emphasis added).)  That Plaintiff Feldman, even after third parties allegedly raised "concerns" about the offering, drafted a letter warning investors that the offering could be deemed "private" severely compromises his allegations in this case.

high level of involvement in the development of the company, is not the type of individual that the securities laws were meant to protect. Therefore, Defendants were not required to register the units of CEP, and Plaintiffs' Section 12(a)(1) claim is dismissed.

    C.    *The Section 15 Claims*

Section 15 of the 1933 Act imposes liability on control persons of companies that have violated Section 12(a). *See* 15 U.S.C. § 77o. Claims brought under Section 15 are entirely dependent on the success of the underlying violation. *See In re AIG Investors Group*, No. 06-CV-1625, 2007 WL 1213395, at *6 n.10 (E.D.N.Y. Apr. 25, 2007) (citing *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)). Since Plaintiffs' Section 12(a)(1) claim fails for the reasons stated above, Plaintiffs' Section 15 claim fails as well.

**III.**    **Conclusion**

For the aforementioned reasons, Plaintiffs' securities law claims are dismissed with prejudice. I decline to exercise supplemental jurisdiction over Plaintiffs' state law contract claim and Defendants' state law counterclaims, *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), and they are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 16), and close the case.

**SO ORDERED.**

Dated: May 18, 2010
White Plains, New York

                                                        */s/ Cathy Seibel*
                                                CATHY SEIBEL, U.S.D.J.